LOWER v. THE BUCHANAN BANK *et al., Appellants.* ·

**Co-sureties, Rights of:** EXECUTION, EFFECT OF RELEASE OF LEVY. Although the statute, (Wag. Stat., p. 370, § 9,) abrogates the common law rule that the voluntary release of one surety discharges the other, yet where, at the request of one surety, the judgment creditor levies upon property of another, and then releases the levy upon the payment of a portion only of the value of such property, he will be held accountable for its full value upon his attempt to collect the remainder of the debt from the first surety; after the levy, he will be regarded as the trustee of the execution for all parties interested, and will not be permitted to injure them by his release of the levy.

*Appeal from Buchanan Circuit Court.*—HON. JOS. P. GRUBB, Judge.

AFFIRMED.

*B. R. Vineyard* for appellants.

*Woodson & Crosby* for respondent. ·

PHILIPS, C.—This is a bill for injunction. It appears that the Buchanan Bank, in 1870, recovered judgment in the circuit court of Buchanan county, against M. D. Morgan, William Ridenbaugh, George I. Gibson and Isaac Lower, for the sum of $4,575.27, founded on a promissory note executed to said bank by Morgan, as principal, and the other parties thereto as sureties. Morgan having failed in business and gone into bankruptcy, Lower notified and requested the bank to sue on the note, so as to protect him as surety, as soon as possible. Ridenbaugh also became insolvent, leaving Lower and Gibson bound to make good

any deficiency not collected from Morgan's estate. There seems to have been in Lower's mind at least some apprehension as to Gibson's solvency. Accordingly, Lower directed Allen H. Vories, attorney for the bank, to have execution issued, and the sheriff directed to levy the same on a lot of cattle discovered by Lower, belonging to Gibson. This was done, and the sheriff levied on cattle of Gibson's, of the admitted value of $1,800. It seems that Vories instructed the sheriff not to levy on exceeding $1,500 worth of property. Gibson gave to the sheriff a delivery bond for the cattle seized. By direction of the bank's attorney, the cattle were released from the levy, on the payment by Gibson of $900, leaving a balance of $4,140.41 unpaid on the judgment. In August, 1871, there was paid thereon by Morgan's estate, $1,288.38. In December, 1871, the plaintiff, Lower, paid thereon $900, leaving a balance yet due of $2,154.11. Afterward, Morgan's estate paid thereon $277.73; so that on the 5th day of May, 1878, there remained unpaid, $3,010.77, when plaintiff paid thereon $1,552.50, being in excess of one-half of said judgment. In December following the sheriff, at the instance of Abbott P. Goff, the assignee of said bank, caused the real estate of Lower to be levied on to satisfy the residue of said judgment, and was proceeding to sell the same, when Lower instituted this action against the bank and Goff, to enjoin the sale.

The defense set up in the answer in justification of the release of Gibson's property from the execution is, that Lower suggested that $900 would be sufficient to pay Gibson's *pro rata* of said judgment, and that was all he desired then to realize from Gibson. The answer admits that thenceforth Gibson became "hopelessly insolvent."

On hearing the evidence, the court found the issues for plaintiff, and made the injunction perpetual. Defendant brings the cause here on appeal.

It is apparent from the allegations of the petition and proofs, that if the bank had realized the $1,800 on the

cattle levied on, it would have collected from Gibson one-half of the judgment remaining after crediting it with the sums collected from Morgan's estate, and to that extent lessened the burdens of the co-surety.

But the defendant contends that conceding all the petition alleges, no cause of action is shown, because, by section 9, chapter 34, page 270, Wagner's Statutes, it was lawful for him to " compound with any and every one or more of his debtors for such sum as he may see fit, and to release him      *      *      without impairing his right to demand and collect the balance, etc., from the other debtors," reserving, however, the right to contribution between the co-debtors. There can be no question but that this statute does away with the common law rule that the voluntary release of one co-surety discharges the other. But whether it applies to the circumstances of a case like the one at bar, appealing so strongly to the protecting arm of the chancellor, does not appear clearly to have been passed on by the Supreme Court of this State.

The only case found in which the equity rule in question between the creditor and surety has been invoked since the foregoing provision was first enacted, (§ 14, pp. 873, 874, vol. 1, Stat. 1855,) is the case of the *State ex rel. Midgett v. Matson*, 44 Mo. 305, decided in 1869. From the reported case it is not apparent when the administrator's bond, which formed the basis of the action, was executed, whether prior or subsequent to the enactment aforesaid. Be this fact as it may, Wagner, J., in delivering the opinion, pages 308, 309, uses this language: "A release of the principal will always discharge the surety; but one surety may be discharged without prejudice to an action against the others to the extent that they would be liable in a suit for contribution between themselves. The discharge of one surety cannot be permitted to increase the liability of the others;" which would indicate that he had in his mind the statutory provision in question, and did not believe it worked the injustice to increase the liability of a surety.

I think this statute means exactly what it says. It is "lawful" for the creditor to compound with one debtor without discharging the co-debtor; but it gives no license to him to release from the operation of his judgment or execution lien, property of a co-surety under circumstances that would operate as a fraud on the other surety and increase his liability. Natural justice demands that one man having become surety with another, shall not have the whole debt thrown on him by the trick, bad faith or gross neglect of the creditor. This he was not permitted by equity to do prior to the statute of 1855; and if he may so do since, of what avail was the proviso of said section, saving to the surety his right of contribution, when by the abuse of the license given in the preceding part of the section the creditor might destroy the means of contribution? No one conversant with equity would for a moment question that if the creditor should so act as to release the principal debtor or to let go a lien held by him on the principal's property, but that it would to that extent discharge the surety. Why should the equity principle be different when applied to his conduct toward the sureties *inter sese?*

In *Baird v. Rice,* 1 Call (Va.) 18, where A recovered judgment against B, and C as surety, and levied on B's property, and then receiving part of the money, extended the time as to the balance and released the goods; held, that C, not having assented to it was entitled to be protected in equity by injunction against a second execution issued against his property. The court say, *inter alia,* that the levy on personal property was in law a satisfaction, at least *pro tanto,* of the execution, and had the sheriff done his duty in making his return according to the legal effect of the levy, it would have appeared that the debt was so far satisfied. But having neglected this duty, the surety was driven into equity for relief, "where things are considered as performed, which ought to have been done." The levy on personal property sufficient to satisfy the judgment, is a satisfaction of the judgment, without some ·controlling

fact. *Blair v. Caldwell,* 3 Mo. 249; Freeman on Execution, § 269. In *Ferguson v. Turner,* 7 Mo. 497, this court first held that such a levy and release discharged the surety. Judge Napton, after conceding that the creditor was under no legal obligation to sue or levy, declares that having acted and secured a specific lien he had no right to yield it without the consent of the surety. "The surety, as soon as the lien of the execution attached, was interested in the retention of that lien, and the discharge of the lien discharged the security."

The supreme court of Mississippi, in *Bowen v. Hoskins,* 45 Miss. 183; *s. c.,* 7 Am. Rep. 728, held that where one of two sureties has made or is about to make a secret fraudulent conveyance, so as to throw the burden of the debt on his co-surety, the principal being insolvent, a court of chancery will interpose to prevent it at the suit of the co-surety; that the same aid will be extended under such circumstances in favor of one surety against another, which will be granted him against the principal. This question is thoroughly discussed by Judge Ryland in *Rice v. Morton,* 19 Mo. 263, where it is held that where A recovers judgment against B and C as sureties, and the holder of the judgment directs the sheriff to return the execution unsatisfied, when one-half of the debt might otherwise have been made out of the property of B, C is discharged to the extent of one-half of the debt.

We must not be understood as advancing the proposition that a creditor is under any obligation to take the *initiative* to protect the surety. He has a right, as a rule, under the statute, to proceed against one or more of his joint debtors, to say to one, you may go, and to the others you must pay all. But where, of his own motion, and especially at the instance of any of the co-debtors, for his protection, the creditor obtains a special security or lien on the property of one of the joint debtors, equity and good faith impose on him a trust duty—to preserve the lien for the protection of the other surety, in order that his right

of contribution may be secured to him. " The principle is that he is a trustee of the execution for all parties interested." *Mayhew v. Crickett*, 2 Swanst. 185, 190. As Judge Ryland, in *Rice v. Morton, supra*, 281, aptly puts it : " The question is not, what degree of diligence is required, or what degree of negligence may be permitted in the judgment creditor, in relation to the safety of the sureties, but how far he may be allowed to injure them by his acts."

The bank knew of Morgan's (the principal's) insolvency and that any deficiency after the distribution of his assets, would have to be made good by the sureties. Ridenbaugh was totally insolvent. Gibson was doubtful. Lower discovered personal property of Gibson's, of a movable character, which if seized immediately could be secured for Lower's protection. He advised the bank of this, and requested it to levy on it. It may be conceded that the bank was under no legal obligation to respond to Lower's request, as it had a right to compound with Gibson and look to Lower to discharge the whole debt. And it may be equally true that Lower at the outset might have protected himself by paying off the debt and pursuing Gibson for contribution. But when the bank was advised of Lower's extremity, and undertook to aid him by making the levy and securing enough property to satisfy Gibson's half of the debt, it became " a trustee of the execution for all parties interested," and it could not " injure them by its acts.". By thus voluntarily undertaking to protect Lower, it lulled him to inaction, and in effect declared to him : I will subject this property to this debt for your protection, and you need take no other action for your security !

The evidence shows that perhaps all parties concerned were of the opinion that $900 from each of the sureties would acquit them, and that each of them accordingly paid that sum. But this belief was begotten in the mind of the sureties by the suggestion of the bank's officer and agent. The evidence wholly fails (and so the circuit judge who heard it must have found) to show that Lower ever re-

quested or consented that the levy on the cattle might be released. If the bank assumed that the $900 paid by Gibson would probably meet his one-half of the liability, after the anticipated dividends from Morgan's estate were realized; while its conduct may have been free from any intended fraud, yet it acted at its peril in releasing the cattle, and it could not plead its misjudgment to the irreparable injury of the co-surety. Lower seems to have done all that an honest surety ought to have done, and if there is a loss to the bank it is not his fault. It is, to put the case mildly for the defendant, an instance where one of two parties of equal merit must suffer from the transaction, and he whose conduct has occasioned the injury should bear the loss.

Defendant's counsel suggests that, as the cattle were not forthcoming according to the requirements of the delivery bond taken by the sheriff, the bond is yet in force, and the plaintiff has his equitable remedy thereon by substitution. It is deemed a sufficient answer to this to say, that where the plaintiff in the execution accepted so much money and consented that the cattle might go, an action could hardly be maintained on the bond for the breach.

In my opinion, under the evidence in this case, the judgment of the circuit court was well sustained, and it is accordingly affirmed. All concur.