ALBERT M. ENGLISH, Respondent, v. JAMES M. SEIBERT *et al.*, Appellants.

St. Louis Court of Appeals, May 3, 1892.

1. **Principal and Surety**: EFFECT OF MERE NON-ACTION OF CREDITOR IN ENFORCEMENT OF ADDITIONAL SECURITY. A creditor of two debtors, who occupy the relation of principal and security, does not impair his claim against the surety by mere non-action or neglect in enforcing a lien against the property of the principal debtor, obtained from such principal through his own exertions after the contraction of the debt, as where, after the recovery of judgment against both debtors, he obtains a chattel mortgage on property of the principal debtor, the benefit whereof is lost owing to its not being acknowledged and, therefore, not recorded, and to the sale of the mortgaged chattels by the principal debtor.

2. ———: EFFECT OF VOLUNTARY SURRENDER OF ADDITIONAL SECURITY BY CREDITOR. A distinction is, however, drawn between the effect in this respect of mere non-action or neglect on the part of the creditor, and affirmative action on his part in voluntarily surrendering such additional security, it being conceded that such voluntary surrender will operate as a release of the surety to the extent of the value of such additional security.

*Appeal from the Cape Girardeau Circuit Court.*—HON. H. C. O'BRYAN, Judge.

REVERSED.

*Wilson Cramer*, for appellants.

*W. H. Miller*, for respondent.

THOMPSON, J.—This is a suit in equity against the plaintiff in a judgment, and also against the sheriff holding an execution thereunder, to enjoin an enforcement of the judgment. The ground of the action was that the plaintiff was a surety in the debt which had passed into judgment, and that, since the rendition of the judgment, the principal defendant had taken a chattel mortgage from the principal debtor upon a crop of wheat, and that he had negligently suffered the principal judgment debtor to make way with the wheat instead of enforcing his security against it,—by reason of which negligence the plaintiff had become released from his obligation to satisfy the debt to the extent of the value of the property embraced in the chattel mortgage. The plaintiff had a decree for a perpetual injunction, and the defendant prosecutes an appeal to this court.

It appeared in evidence that, on February 5, 1876, Hiram T. Dickerson and Albert English executed their joint note for $125 to Lowndes H. Davis; that, after the maturity of said note, the defendant Seibert became the purchaser and owner thereof; that Seibert brought suit thereon against both of the makers thereof, and recovered judgment against them; that in the meantime Seibert had removed from Cape Girardeau to Jefferson City, and had left the collection of his debts and the charge of his business in the hands of R. P. Wilson, as his agent and attorney. The scope of Wilson's powers as agent and attorney does not very distinctly appear. Wilson brought suit on the note and prosecuted it to judgment for Seibert. He caused execution to be sued out thereunder, which execution,

at the request of English, he caused to be returned unsatisfied, English paying the costs. English was solvent, but Dickerson, the other judgment defendant was not. Wilson knew that English was surety on the note for Dickerson, although he did not appear to be such on the face of the note. He testified: "I had been attempting to collect the judgment from Dickerson, *knowing him to be the principal*, and conversed frequently with Albert M. English about the matter, that he might assist me in the collection of the debt, *so as to assist himself.*" In another place Wilson testifies: "I knew or was informed by the parties that English was a surety on the note."

After the note had thus been reduced to judgment, it was arranged between Dickerson, the principal judgment defendant, and Wilson, acting as attorney and agent for Seibert, the plaintiff in judgment, that Dickerson should secure the judgment by giving a chattel mortgage upon his crop of wheat. But, when it came to fulfilling this agreement, Dickerson merely *signed* such a mortgage and *delivered* it to Wilson, but refused to *acknowledge* it formally so that it could be put upon record. His object in refusing to acknowledge it and have it go to record was that he did not wish to make a public disclosure of the fact of giving it. Of course, the mortgage was good between the parties after being signed and delivered, without being formally acknowledged and recorded.

After thus having given the chattel mortgage, Dickerson proceeded to harvest and thresh his wheat, and to market it load by load. As fast as he sold it, some of his other creditors would pounce upon him, and get the money away from him, as he testifies, for he was deeply involved in debt. Before Dickerson had threshed his wheat, Wilson informed English, this plaintiff (the surety), that he had taken this mortgage.

It was also in evidence that, when Dickerson began to thresh the wheat covered by the mortgage, Cracraft, the sheriff, stepped into the office of Wilson, English being present, and advised Wilson of the fact that Dickerson was threshing his wheat, and told him that it was now time to make his money on the chattel mortgage. Nevertheless, Wilson wholly neglected to take any step to enforce the mortgage, or to prevent Dickerson from marketing his wheat and pocketing or disposing of the proceeds. Wilson himself testifies: " I never realized anything out of the chattel mortgage, and made no effort to collect proceeds of the wheat, or to take the property into my charge under the chattel mortgage. When Dickerson refused to have his acknowledgment taken, while I put the chattel mortgage in my desk, I paid no attention whatever to it, but made an agreement with him outside of that mortgage that he should put his wheat into Horrell's mill, and notify me when he did so, in order that I could go and draw the money. I made no effort to realize on the mortgage." The value of the wheat was less than the amount of the judgment; but English, having ascertained the value of the wheat, tendered the difference between its value and the amount of the judgment, namely, $130, to Wilson, which tender was rejected. He thereafter brought the present action in equity to enjoin the enforcement of the judgment to the extent of the value of the wheat covered by the mortgage.

Upon this state of facts we take the law to be that English was not entitled to an injunction. This conclusion seems indisputable, notwithstanding several propositions of law invoked by the plaintiff, which are firmly settled in this state. One of these propositions is that a comaker of a promissory note, not negotiated before maturity in the usual course of business, may

show by evidence *aliunde*, that it was understood by
the parties that his liability was that of a surety, and
that he has been discharged by such matters subse-
quent as would discharge any other surety. *Noll v.
Oberhellman*, 20 Mo. App. 336. Another of these prin-
ciples is that the relation of principal and surety, and
the rights of a surety in respect of his exoneration by
matters subsequent, are not destroyed by the fact of
reducing to judgment the debt for which he stands as
surety. *Priest v. Watson*, 75 Mo. 314; *Rice v. Morton*,
19 Mo. 263; *Smith v. Rice*, 27 Mo. 505. Another
principle is that, while a creditor is not in general
bound to take any *initiatory steps* to protect the surety
in the debt, yet if the creditor does take into his
hands property of the principal debtor to be applied in
discharge of the debt, or acquires in any manner a
valid lien upon such property, and afterwards volun-
tarily releases such property or such lien, he thereby
exonerates the surety to the extent of the value of such
property, or to the extent of what could have been real-
ized by the enforcement of such lien. *Ferguson v.
Turner*, 7 Mo. 497; *Rice v. Morton*, 19 Mo. 280; *Priest
v. Watson*, 75 Mo. 315; *Lower v. Bank*, 78 Mo. 67.
The principle is applied not only to exonerate a surety
where another lien or security is held by the creditor
against the principal debtor and released, but also to
exonerate him *pro tanto* where such a lien or security is
held by the principal debtor against a cosurety and
released. The principle has been applied where a levy
has been made and released (*Lower v. Bank, supra*;
*Priest v. Watson*, 75 Mo. 310); and even where the
creditor, having reduced his demand to judgment, has
sued out an execution thereon which became a lien
upon property, which execution he afterwards volun-
tarily recalled. *Rice v. Morton*, 19 Mo. 263; *Ferguson
v. Turner*, 7 Mo. 497. It cannot be doubted that the

principle equally applies where the creditor, after
having reduced his claim to judgment, takes a chattel
mortgage from the principal debtor with the view of
exonerating the other judgment debtor who is a
surety. The principle stated by Mr. Commissioner
PHILIPS, in dealing with this subject, is quite applica-
ble to such a case: "Where, of his own motion, and
especially at the instance of any of the co-debtors, for
his protection,. the creditor obtains a special security or
lien on the property of one of the joint debtors, equity
and good faith impose on him a trust duty to preserve
the lien for the protection of the other surety, in order
that his right of contribution may be secured to him."
*Lower v. Bank*, 78 Mo. 67, 71. It can make no differ-
ence with the operation of the principle what species of
lien or special security the creditor takes of the prin-
cipal debtor or of one of the cosureties.

But we take it that this principle cannot be invoked
so as to help out the plaintiff on the state of facts dis-
closed by this evidence. The principle, which runs
through all the cases above cited, and all the cases on
the subject with which we are acquainted, is that, while
the creditor is not bound to put himself to any trouble,
or to do any affirmative act for the purpose of helping
out the surety, except in cases under the statute where
the surety may call upon him to bring suit, yet, if he
does do some affirmative act by which he secures a valid
lien or security upon the property of the principal
debtor, then he is bound to hold on to that lien or
security; and, if by another affirmative act he releases
it, he exonerates the surety. But he is bound to do no
more than merely to hold on to it. Having exerted
himself in getting it, he is not bound to put himself to
any further exertion in order to enforce it. We know
of no case where it is *held* that, if by his mere negligence
or non-action the lien or security becomes fruitless, this

releases the surety.   It is indeed *said* by Judge NORTON, in giving the opinion of the court in *Priest v. Watson*, 75 Mo. 315, that, "if the payee has a specific lien on the property of the debtor sufficient to satisfy the debt, and voluntarily surrenders the lien or loses it by his own neglect, the surety will be discharged." But it is evident that in this *dictum* the learned judge was not using language with his usual care. He seems to have been misled into the expression by following the language of the syllabus in *Ferguson v. Turner*, 7 Mo. 497. That syllabus does not correctly state the doctrine of the court. In that case the creditor had reduced his demand to judgment, and had sued out an execution and placed it in the hands of the sheriff, and the principal debtor had property subject to this execution, amply sufficient to satisfy it. Nevertheless, before the return day, the creditor, at the instance of the principal debtor, directed the writ to be returned unsatisfied, and took a deed of trust upon the property of the principal debtor, thus subject to the execution, to secure the payment of the judgment within four months from the date of the deed. This deed the creditor neglected to have recorded; and in a short time thereafter the whole property of the principal debtor, including that covered by this deed, was swept away by other executions. The court held that the surety was released, not because of the neglect of the creditor to have the deed of trust recorded, but because of his affirmative act in causing the execution, which had become a specific lien upon the property, to be returned unsatisfied. NAPTON, J., said: "They surrendered a specific lien, by which the debt was perfectly secure, and without consent of the surety. Shall they, after such conduct, be permitted to go upon the security? Admitting the deed of trust was a perfect nullity, and so it was for all valuable purposes, they had chosen to sue the debtor, which

they were not obliged to do, and had prosecuted that suit to judgment. Execution had issued, and was in the hands of the sheriff a lien upon the personal property of the debtor. This lien they voluntarily discharged, without consideration. This they had no right to do. The security, so soon as the lien of the execution attached, was interested in the retention of that lien, and the discharge of the lien discharged the security."

So, in the case in which Judge NORTON used the inaccurate expression above quoted, the holder of a negotiable promissory note had reduced it to judgment against the maker, and had caused execution under the judgment to be levied upon property of the maker sufficient to pay the debt, and afterwards voluntarily released the levy without the consent of one who was an accommodation indorser, and consequently a surety upon the paper. It was held that this operated to release the indorser. He was not released by reason of the negligence of the creditor in failing to go forward and do some further affirmative act to enforce the lien which he had obtained by his levy; but he was released by reason of the affirmative and voluntary act of the creditor in releasing that levy, which the surety had a right to have retained for his own benefit and exoneration. We must, therefore, take it that, as Wilson acting for the defendant did no affirmative act to release or discharge the lien of the chattel mortgage, but merely neglected to go forward and constitute himself the active agent or trustee of the surety for the purpose of enforcing it, the surety has not been discharged under the principle of law which he invokes. He knew of the existence of the mortgage; he knew when the principal debtor threshed his wheat. He might then have paid the debt, which he stood under a legal obligation to pay, and might have demanded that the mortgage be

assigned to him, and might have proceeded under it by seizing the wheat. Having failed to do this, he cannot upon any principle with which we are acquainted cast upon the creditor the loss which happened through the misconduct of the principal debtor. When it is said that, in such a case, the creditor, by taking additional security or acquiring a lien, constitutes himself a trustee for the surety in order to preserve for his benefit the advantage thus gained, it is not meant that he constitutes himself an active trustee, in the sense of being obliged to go forward and take any other affirmative steps for the benefit of the surety. The meaning is that he can go forward as far as he wishes, but that, having by going forward acquired any advantage, he cannot voluntarily go backward and surrender it.

The judgment of the circuit court will be reversed. All the judges concur.